# STATE OF MICHIGAN

# COURT OF APPEALS

CMC TELECOM, INC,

        Plaintiff-Appellant,

v

NEYER TISEO & HINDO, LTD, doing business
as NTH CONSULTANTS, LTD,

        Defendant-Appellee.

UNPUBLISHED
February 21, 2017

No. 327955
Oakland Circuit Court
LC No. 2012-125166-CK

Before: WILDER, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Plaintiff, CMC Telecom, Inc, appeals as of right the trial court's verdict of no cause of action in favor of defendant, Neyer Tiseo & Hindo, LTD, doing business as NTH Consultants, LTD. We affirm.

## I. FACTUAL BACKGROUND

This breach of contract action arises out thousands of alleged fraudulent calls placed remotely by hackers who compromised defendant's voicemail system. The primary question presented below was whether defendant was obligated to pay for such fraudulent calls under its telecommunications agreement with plaintiff. There was a prior appeal in this case at the summary disposition stage. *CMC Telecom, Inc v Neyer Tiseo & Hindo, LTD*, unpublished opinion per curiam of the Court of Appeals, issued September 23, 2014 (Docket No. 315338) (*CMC I*). Much of the pertinent factual background is set forth by *CMC I*, and the parties stipulated to many other relevant "uncontested" facts at trial.[1]

"Plaintiff is a local telephone provider who purchases long distance and international phone service from Level 3, a wholesaler, and resells these services to [plaintiff's] customers."

---

[1] Such stipulated facts are "sacrosanct" and must be accepted as true. See *Dana Corp v Appeal Bd of Mich Employment Security Comm*, 371 Mich 107, 110; 123 NW2d 277 (1963); see also *Staff v Johnson*, 242 Mich App 521, 535; 619 NW2d 57 (2000). Accordingly, we quote the parties' stipulated facts in this opinion where practicable.

-1-

*Id.* at 1. Plaintiff began providing telecommunication services to defendant's Dearborn office in 2006. "Plaintiff provided Defendant with a voicemail system with an integrated call forwarding service on certain of Defendant's phone lines for use at the Dearborn Office."

During the timeframe at issue in this case, the parties' agreement was memorialized primarily by two "basic documents": a "customer service order" (CSO) and a "service terms and conditions" agreement (the Service Terms agreement). The Service Terms agreement was the principal contract between the parties. On the other hand, the CSO was a supplemental agreement.

The pertinent provisions of the Service Terms agreement are as follows:

> **PAYMENT.** Customer shall pay CMC for Services pursuant to this Agreement.

> \* \* \*

> **LIMITATION OF LIABILITY**. . . . **CMC SHALL NOT BE LIABLE FOR ANY LOSSES OR DAMAGES RESULTING FROM . . . THE . . . OPERATION, USE, OR MISUSE OF AN ACCOUNT, EQUIPMENT, OR SERVICES** . . . .

The Service Terms agreement contains "a merger provision which expressly provides that the Service Terms [agreement] and the documents explicitly referenced therein constitute the parties entire agreement, and 'supersedes all other agreements, whether written or oral.' " On the other hand, in pertinent part, the CSO provides, "By executing this Customer Service Order [CSO], Customer [defendant] is ordering the Services set forth herein and on related documentation. Customer agrees to pay for all Services ordered or otherwise used[.]" Neither the Service Terms agreement nor the CSO define the terms "Services," "ordered," or "used," and "[n]one of Plaintiff's alleged contracts with Defendant reference any variation of the word fraud."

In early March of 2011, more than 20,000 fraudulent international calls were placed using three lines associated with defendant's account. Plaintiff's "switch engineer," Norman Joseph Diedrich, investigated the fraudulent call incident and determined that the fraudulent calls were placed when defendant's voicemail system was compromised by hackers, who remotely changed defendant's voicemail settings to forward all calls to "an international location number." The hackers' use of defendant's "call forwarding always" function allowed them to make such a high volume of calls despite the relatively short period of time at issue. A call so forwarded was never routed through defendant's hardware, only through the voicemail server and the hardware of plaintiff and Level 3; thus, the hackers were able to place up to 240 international calls simultaneously. Defendant would have had no way to know the fraudulent calls were being placed until plaintiff or Level 3 alerted it of that fact. Diedrich opined that the fraudulent calls "were definitely made," but he admitted that his opinion in this regard was premised solely on the fact that "[t]he calls were recorded by Level 3." Diedrich also admitted that he "kn[e]w nothing about Level 3's billing."

"Plaintiff issued an invoice to Defendant dated April 10, 2011 for $224,082.58, including charges for the fraudulent international calls at issue," and "Defendant paid Plaintiff the

undisputed portion of the invoice, leaving a disputed balance of $209,993.28. . . ." The April 10, 2011 invoice is 280 pages long and was not prepared by plaintiff or its employees but "by one of Plaintiff's vendors, Profitec, Inc. ('Profitec'). . . ." Moreover, "[t]he international call charges . . . reflected in the [April 10, 2011] invoice . . . are based on call data that was generated by Level 3 and not on any call data generated by Plaintiff." After defendant refused to pay the disputed balance, plaintiff instituted this action.

Plaintiff called only three witnesses at trial. The first, Rhonie Hamel, is the accounts receivable manager for plaintiff. Hamel testified that the person at Profitec who would have personal knowledge about how the April 10, 2011 invoice was generated is Caren Bennett, who was never deposed or called as a witness at trial. Hamel was unsure whether any of plaintiff's employees ever actually reviewed the "raw call data" from which the April 10, 2011 invoice was compiled. Plaintiff attempted to have Hamel offer "trade usage" testimony, but such testimony was excluded because plaintiff failed to establish that Hamel was a competent expert with the ability to offer such testimony.

Plaintiff's second witness was the switch manager, Diedrich. Through Diedrich's testimony, plaintiff attempted to introduce documents regarding how "Comcast" and "Bright House Networks" handle fraudulent calls, but those exhibits were excluded on hearsay grounds after Diedrich testified that he was unfamiliar with the documents and their origin.

Finally, plaintiff called its president and sole owner, Craig Champagne. Champagne acknowledged that, other than asking the billing company, Profitec, to compile the April 10, 2011 invoice, plaintiff did nothing to verify the accuracy of the billed calls. During Champagne's testimony, plaintiff attempted to introduce several documents Champagne had located online. The documents in question concerned the "toll fraud" policies of several major telecommunications companies. Defendant objected, arguing that the documents were inadmissible hearsay. Plaintiff responded by arguing that the documents were admissible under MRE 803(24), i.e., the "catch-all" hearsay exception. The trial court held that the documents were not admissible under the catch-all exception.

At the conclusion of the trial, the trial court issued a written opinion and order in favor of defendant. This appeal ensued.

## II. ANALYSIS

Plaintiff first argues that the trial court committed error requiring reversal by excluding plaintiff's proffered trade usage evidence. We disagree.

Plaintiff's failure to duly preserve this issue for appeal is fatal to its instant claim of error. "[I]t is well settled that in order to preserve the issue of the admissibility of evidence for appeal, the proponent of evidence excluded by the trial court must make an offer of proof." *Detroit v Detroit Plaza Ltd Partnership*, 273 Mich App 260, 291; 730 NW2d 523 (2006). Plaintiff did not make an offer of proof regarding any of its excluded trade usage evidence, and hence our review is for plain error affecting plaintiff's substantial rights. See *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 541; 854 NW2d 152 (2014). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or

obvious, 3) and the plain error affected substantial rights." *In re Contempt of Henry*, 282 Mich App 656, 666; 765 NW2d 44 (2009), quoting *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763. Without an offer of proof, it is impossible for plaintiff to carry its burden of proving that the exclusion of the trade usage evidence prejudiced it. Thus, plaintiff's instant claim of error necessarily fails. See *People v Hampton*, 237 Mich App 143, 154; 603 NW2d 270 (1999) ("Because defendant did not make an offer of proof at trial regarding the substance of Parkman's excluded testimony, we are unable to conclude that the exclusion of Parkman's testimony affected defendant's substantial rights.").

Plaintiff also argues that the trial court either erred or relied on clearly erroneous factual findings when it decided, following trial, that plaintiff had failed to carry its burden of proving its claims by a preponderance of the evidence. We again disagree.

"We review a trial court's findings of fact for clear error, giving particular deference to the trial court's superior position to determine witness credibility." *Miller-Davis Co v Ahrens Construction, Inc*, 495 Mich 161, 172; 848 NW2d 95 (2014) (*Miller-Davis*). "A factual finding is clearly erroneous if there is no substantial evidence to sustain it or if, although there is some evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Id.* at 172-173 (footnotes omitted). On the other hand, "[t]he existence and interpretation of a contract are questions of law reviewed de novo." *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006).

As an initial consideration, we reject plaintiff's portrayal of the federal caselaw it cites as "controlling" over this matter. Although "federal precedent is generally considered highly persuasive when it addresses analogous issues," such precedent is "not binding on this Court" under the doctrine of stare decisis. *Wilcoxon v Minnesota Mining & Mfg Co*, 235 Mich App 347, 360; 597 NW2d 250 (1999). Moreover, "the interpretation of a contract is ordinarily a matter of state law," *DIRECTV, Inc v Imburgia*, ___ US ___, ___; 136 S Ct 463, 468; 193 L Ed 2d 365 (2015), and "the Michigan Supreme Court has the ultimate responsibility for determining a question of state law," *In re Apportionment of State Legislature*, 413 Mich 96, 116; 321 NW2d 565 (1982). See also *Mullaney v Wilbur*, 421 US 684, 691; 95 S Ct 1881; 44 L Ed 2d 508 (1975) ("[S]tate courts are the ultimate expositors of state law").

In any event, based on Michigan law and the facts of the case at bar, we discern no error warranting reversal. "A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis*, 495 Mich at 178. The first element is undisputed here; both parties admit that a contract existed. The determinative question is whether defendant was obligated to pay for the fraudulent calls and, by failing to do so, breached the parties' agreement.

As explained by the *Miller-Davis* Court,

[O]ur primary task in construing a contract . . . is to give effect to the parties' intention at the time they entered into the contract. We determine the parties'

-4-

intent by examining the language of the contract according to its plain and ordinary meaning. In doing so, we avoid an interpretation that would render any portion of the contract nugatory. [*Miller-Davis*, 495 Mich at 174.]

Contractual ambiguities can be either patent or latent. *Shay v Aldrich*, 487 Mich 648, 668; 790 NW2d 629 (2010).

> A contract is patently ambiguous only if, after the court has engaged in its judicial duties of giving effect to the contract's language, the court concludes that a term is equally susceptible to more than a single meaning, or that two provisions of the same contract irreconcilably conflict. . . . [*Id.* at 678 (quotation marks, citations, and emphasis omitted).]

Contrastingly, "[a] latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the necessity for interpretation or a choice among two or more possible meanings." *Id.* at 668 (quotation marks and citations omitted). "It is an elementary rule of construction . . . that in case of doubt, a contract is to be strictly construed against the party by whose agent it was drafted." *Id.* at 673.

Here, although the trial court's opinion and order does not contain the phrase "latently ambiguous," or other words to the same effect, the trial court's analysis of extrinsic evidence strongly suggests that it found latent ambiguity in the parties' agreement. The trial court reasoned, "[t]he term 'services' is not defined *and none of Plaintiff's witnesses provided testimony establishing that 'services' included fraudulent international calls*." (Emphasis added.) Through such analysis, the trial court considered testimony (i.e., extrinsic evidence) as a means of discerning the parties' intent—an exercise that was only permissible if the language of the agreement was ambiguous. See *Blackhawk Development Corp v Village of Dexter*, 473 Mich 33, 49; 700 NW2d 364 (2005). Because the trial court is presumed to have known and properly applied the law, see *Charles A Murray Trust v Futrell*, 303 Mich App 28, 44; 840 NW2d 775 (2013), we do not presume that the trial court impermissibly considered extrinsic evidence. Instead, we presume that the court found the parties' agreement to be ambiguous. And because no patent ambiguity is apparent in the contractual language—indeed, the parties have never argued that their agreement was patently ambiguous—we further presume that the trial court found the parties' agreement to be latently ambiguous.

We perceive no error in that conclusion. Plaintiff emphasizes the "**LIMITATION OF LIABILITY**" language from the Service Terms agreement, which provides that plaintiff "**SHALL NOT BE LIABLE FOR ANY LOSSES OR DAMAGES RESULTING FROM** . . . **THE . . . OPERATION, USE, OR MISUSE OF AN ACCOUNT, EQUIPMENT, OR SERVICES**. . . ." Plaintiff posits that the fraudulent use of defendant's voicemail to place international calls constitutes "misuse of an account, equipment, or services," further contending that, under the terms of the agreement, plaintiff "shall not be liable" for such misuse. But the fact that plaintiff is *not* "liable" to defendant does not mean that defendant *is* liable to plaintiff. On the contrary, the plain language in question establishes nothing more than a limitation on plaintiff's liability.

Moreover, as applied to the facts of this case, we find the pertinent portion of the CSO to be latently ambiguous. The CSO provides, "Customer agrees to pay for all Services *ordered or otherwise used. . . .*" (Emphasis added.) It cannot be rationally argued that defendant "ordered" the fraudulent calls; plaintiff's switch manager, Diedrich, admitted at trial that defendant had no way to know about the fraudulent calls until it was notified by plaintiff or Level 3. Hence, the question becomes whether the fraudulent calls qualify as services "otherwise used." It is in this respect that the latent ambiguity arises. The construction offered by plaintiff is facially reasonable. But the agreement does not specify whether defendant was agreeing to pay for services used by itself *only* or those used by itself *and* third parties. Given the CSO's lack of specificity, either construction is reasonable. Therefore, the CSO is latently ambiguous.

Standing alone, of course, that latent ambiguity was not fatal to plaintiff's position, even in light of *contra proferentem*. That rule of construction—"that ambiguities are to be construed against the drafter of the contract"—"should only be applied if all conventional means of contract interpretation, including the consideration of relevant extrinsic evidence, have left the finder of fact unable to determine what the parties intended their contract to mean." *Woodington v Shokoohi*, 288 Mich App 352, 376; 792 NW2d 63 (2010). As explained in *CMC I*, "an integrated writing 'may be explained or supplemented by operative usages of trade, by the course of dealing between the parties, and by the course of performance of the agreement.' " *CMC I*, unpub op at 3, quoting Restatement Contracts, 2d, § 209, Comment A. Thus, by introducing extrinsic evidence at trial, plaintiff could have proven that the CSO's latent ambiguity should be construed against defendant.

At trial, however, despite the opportunity to do so, plaintiff was unable to produce any admissible evidence regarding trade usage. Plaintiff's evidence that some number of unidentified clients had, at some time in the past, paid for allegedly fraudulent calls does not establish that doing so is standard practice in the telecommunications industry. Plaintiff was also unable to present any "course of dealing" or "course of performance" evidence that the trial judge, as trier of fact, found credible or persuasive. Nor was plaintiff able to produce any witnesses competent to testify regarding the veracity of the April 10, 2011 invoice or to explain its seeming internal inconsistencies. Champagne admitted that plaintiff did nothing to verify the accuracy of the billed calls. Because of the limited proofs offered by plaintiff, the trial court was not satisfied that defendant breached the parties' agreement or that the April 10, 2011 invoice had been proven to be accurate, and we are not definitely or firmly convinced that the trial court made a mistake in that regard. The ultimate failure in plaintiff's proofs is not attributable to any error by the trial court but rather to plaintiff's decision to call only three witnesses, to call no expert witnesses, and to fail to secure admissible evidence regarding trade usage.

Thus, the trial court did not err by construing the latent ambiguity in the parties' agreement against plaintiff. Given the lack of admissible extrinsic evidence to indicate that the ambiguity should be construed against defendant, the trial court could properly rely on the rule of *contra proferentem*. Moreover, given the fact that the burden of proof rested with plaintiff, it was appropriate for the trial court to determine that plaintiff had failed to prove its case by a preponderance of the evidence.

Affirmed.  As the prevailing party, defendant may tax costs pursuant to MCR 7.219.


/s/ Kurtis T. Wilder
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly