Fitzgerald, J.
 

 Following a jury trial, defendant was convicted of possession with intent to deliver more than 225 but less than 650 grams of cocaine, MCL 333.7401(2)(a)(ii); MSA 14.15(7401)(2)(a)(ii), possession with intent to deliver less than fifty
 
 *145
 
 grains of cocaine, MCL 333.7401(2)(a)(iv); MSA 14.15(740l)(2)(a)(iv), and resisting and obstructing arrest, MCL 750.479; MSA 28.747. He was sentenced to prison terms of 240 to 360 months, 160 to 240 months, and twenty-four to forty-eight months, respectively. Defendant appeals as of right. We affirm.
 

 On January 30, 1997, police raided the home of Brian Sumner after conducting two or three controlled purchases of cocaine at his residence. A substantial amount of cocaine was seized during the raid. Officer Timothy Gonzalez interviewed Sumner and informed him that the police wanted to know who his suppliers were and that if Sumner was willing to cooperate with police in three “busts” Gonzalez would try to “work out” a deal with the prosecutor with respect to the charges facing Sumner. Sumner named defendant, Frank Hampton, III, as his supplier. Sumner and defendant were long-time acquaintances but not close friends.
 

 A few days later, Gonzalez and Lt. Frank Saucedo met with Sumner. Sumner indicated that if he “set up” defendant, he would not be able to set up anyone else. Gonzalez eventually agreed to this arrangement and told Sumner to call defendant and set up a time for defendant to deliver drugs to Sumner, at which time the officers would catch defendant with the drugs (a “buy/bust”).
 

 On March 23, 1997, Gonzalez contacted Sumner and told him that a drug deal needed to be completed that day. Gonzalez arranged for surveillance of both defendant’s house and Sumner’s house. Sumner called defendant and then went to defendant’s house at 1045 Chittock Street in Jackson. Defendant was not home, and Sumner returned approximately one hour later.
 
 *146
 
 Defendant was heading toward his house and told Sumner to go home and that he would talk to Sumner later. Sumner went home, called defendant, and told him he needed a “couple of ounces.” Defendant indicated that he would be over in a little while to talk to him. Sumner reported this conversation to Gonzalez on Gonzalez’ cellular phone.
 

 Approximately fifteen minutes later, while Sumner was outside near a sidewalk, defendant drove up in his blue Mercedes. The two men spoke outside the car. Defendant indicated that he did not bring the drugs because the price had been raised from $900 to $1,000 an ounce, and he wanted to make sure that Sumner still wanted them. Officer Ted Ahlers observed defendant talking with Sumner and did not see Sumner hand anything to defendant. Defense witnesses Maurice Pool and Phillip Cole also observed defendant talking with Sumner and did not see Sumner hand anything to defendant. After defendant left, Sumner phoned Gonzalez and indicated that defendant was going to get the drugs.
 

 Approximately five to ten minutes later, defendant returned to his house and, about three minutes later, left again. Officer Ahlers, who lived next door to defendant and who was surveilling defendant’s house, radioed to Gonzalez and informed him that defendant left his residence and was heading north on Chittock in a blue Mercedes. Gonzalez attempted to intercept defendant’s vehicle, but failed. Gonzalez radioed that defendant was leaving the intersection at a high rate of speed. Defendant proceeded to turn into a driveway and to drive through residential backyards before reaching a fence. Officer Timothy Black and Officers Gleeson and Demeuse, who were assigned to assist in
 
 *147
 
 the traffic stop, observed defendant running on foot. Gleeson, Demeuse, and Black ordered defendant to surrender. Defendant continued to run and was eventually apprehended by a police dog while attempting to jump a fence. At that time, defendant threw a hat over the fence, leaving a trail of white powder.
 

 Upon defendant’s arrest, Gonzalez instructed Officer Ahlers to surround and secure defendant’s house until a search warrant could be obtained. Officer Gonzalez prepared an affidavit and warrant, which were presented to and signed by a district judge. The search warrant was presented to defendant’s mother, who used a key to unlock defendant’s door. Upon execution of the warrant, the officers seized 396.64 grams of cocaine from inside a brown duffel bag in an upstairs bedroom and 8.6 grams of marijuana from a dresser in an upstairs hallway. Additionally, the officers seized 27.63 grams of cocaine from a bag thrown by defendant, 0.28 grams of cocaine from defendant’s car, and 0.21 grams of cocaine from the inside of defendant’s hat. Also seized was $14,000 in cash.
 

 Defendant’s theory of the case was that Sumner planted the cocaine on defendant and in defendant’s house. Golden Gibson testified that he and defendant were working together in an automobile salvage and resale business and that he had given defendant the proceeds from two automobile auctions to invest ($4,700), the proceeds from the wholesale of some cars ($8,500), and the proceeds from the sale of three other cars ($1,700).
 

 Carmen Wade, defendant’s girlfriend, testified that at least five or six of defendant’s siblings had keys to his house and that the bedroom where the cocaine
 
 *148
 
 was seized was a storage room. She testified that she had never seen the brown duffel bag in the room.
 

 Several of defendant’s friends and relatives, including Montell White, Kandra Walker, and LaDonna Hampton Lewis, testified that they attended a gambling party at defendant’s residence on March 22, 1997. They testified that Sumner was hosting the party. They also testified that they observed Sumner standing by the bar while holding a brown duffel bag, but that they did not know what subsequently happened to the bag.
 

 Charles Suddeth testified that he observed the conversation between Sumner and defendant at Sumner’s house on March 23 and that he saw Sumner hand a sack of white powder to defendant and ask defendant to weigh it for him. Defendant became irate and said he did not have time, and Sumner persisted because he “had left his scales behind the bar at defendant’s house.” After further argument, defendant snatched the bag and left. Shortly thereafter, Suddeth saw defendant being pursued by police.
 

 Defendant first claims that the evidence discovered as a result of the search at his residence should have been suppressed because the search warrant’s description of the premises to be searched was inaccurate. A trial court’s ruling regarding a motion to suppress evidence as illegally seized will not be reversed on appeal unless it is clearly erroneous.
 
 People v Toodle,
 
 155 Mich App 539, 543; 400 NW2d 670 (1986). A ruling is clearly erroneous when it leaves this Court with a definite and firm conviction that the trial court made a mistake.
 
 People v Hahn,
 
 183 Mich App 465, 469; 455 NW2d 310 (1989), remanded on other grounds 437 Mich 867 (1991).
 

 
 *149
 
 Page one of the “Search Warrant and Affidavit” described the premises to be searched as follows:
 

 A two story wood frame single family dwelling tan with brown trim and an open extended porch. This house is on the east side of Chittock St two houses north of Rockwell St. This residence is more commonly known as 1045 Chittock St. This residence is located in the City of Jackson,. County of Jackson, and the State of Michigan.
 

 Page four of the “Search Warrant and Affidavit,” which constitutes the search warrant, described the premises to be searched as follows:
 

 624 Onondaga, township of Ypsilanti, county of Washtenaw, state of Michigan. The location is further described as a tri-level, single family dwelling with white siding, light colored brick, black shutters, and a one car attached garage. The front door faces to the east and the numbers 624 are to the left of the door.
 

 Defendant correctly points out that the description of the premises on page four of the search warrant and affidavit is inaccurate. Officer Timothy Gonzalez testified that he prepared the search warrant and affidavit using a new computer template. He assumed that the computer would automatically transfer the description of the premises to be searched from the affidavit to the search warrant. Therefore, he did not retype the description of the premises to be searched on the search warrant. He printed the four-page document entitled “Search Warrant and Affidavit” and presented it to the district judge. After reading the three-page affidavit and establishing that there was probable cause to search defendant’s residence, the district judge signed pages three (the affidavit) and four (the search warrant). Neither the district judge
 
 *150
 
 nor Officer Gonzalez was aware that the description of the premises on page four was different than the description of the premises on page one.
 
 [1]
 
 The error was not discovered until the day after the search was concluded.
 

 It is undisputed on appeal that the affidavit for the search warrant accurately describes defendant’s residence and provides probable cause for the search. Defendant contends that because the warrant on its face is not ambiguous, a peace officer executing the warrant would have no reason to refer to the affidavit to determine the premises to be searched. The prosecutor, on the other hand, contends that because the affidavit accurately described the premises to be searched, because the officers executing the warrant personally knew which premises were intended to be searched, and because the correct premises were searched, the typographical error in the warrant does not require suppression of the evidence seized from the premises.
 

 The constitutions of both Michigan and the United States state that a warrant shall not issue without particularly describing the place to be searched. US Const, Am IV; Const 1963, art 1, § 1; MCL 780.654; MSA 28.1259(4);
 
 People v Garvin,
 
 235 Mich App 90; 597 NW2d 194 (1999). The test for determining whether the description in the warrant is sufficient to satisfy the particularity requirement is whether the description is such that the officers with a search warrant can with reasonable effort ascertain and identify the place intended.
 
 Steele v United States,
 
 
 *151
 
 267 US 498, 503; 45 S Ct 414; 69 L Ed 757 (1925);
 
 United States v Gahagan,
 
 865 F2d 1490, 1496 (CA 6, 1989). The Fourth Amendment safeguard is designed to require a description that particularly points to a definitely ascertainable place so as to exclude all others.
 
 Id.
 
 Thus, the test for determining the sufficiency of the description of the place to be searched is (1) whether the place to be searched is described with sufficient particularity to enable the executing officer to locate and identify the premises with reasonable effort, and (2) whether there is any reasonable probability that another premises might be mistakenly searched.
 
 Id.
 
 at 1496-1497. The requirement is designed to avoid the risk of the wrong property being searched or seized.
 

 Here, the trial court found that there was no probability that another premises might be mistakenly searched. In making this determination, the court noted that the affidavit contained an accurate description of the premises to be searched, that Officer Ahlers lived next door to defendant, that officers had surveilled the drug transaction and had defendant’s residence secured and surrounded while awaiting the issuance of a search warrant, and that the affiant executed the warrant and was aware of the premises to be searched. Therefore, the clerical error in the warrant was of no consequence to those executing the warrant.
 

 In
 
 People v Westra,
 
 445 Mich 284; 517 NW2d 734 (1994), a search warrant that led to the seizure of evidence listed an incorrect address for the house in which the defendant’s apartment was located. The Court held that suppression of the evidence was not required under the circumstances of the case:
 

 
 *152
 
 In
 
 [People v Urban,
 
 228 Mich 30; 199 NW2d 701 (1924)], the warrant description, although inaccurate, when taken together with the affidavit and the knowledge of the police officers, was held adequate to define the premises to be searched.
 
 [Westra, supra
 
 at 286.]
 

 Similarly, in
 
 People v Hopkins,
 
 79 Mich App 723; 262 NW2d 675 (1977), this Court held, “If the description in the warrant is defective, that defect is cured by the affidavit which is to be read with the warrant in judging alleged defects.”
 
 Id.
 
 at 724.
 

 Neither
 
 Westra
 
 nor
 
 Hopkins
 
 is factually identical to this case. A close examination of those cases reveals that where the warrant was imprecise or unclear, the court referred to the attached affidavit, which was more precise in its description of the place to be searched, and to the knowledge of the executing officer. However, neither case involved a situation in which the affidavit indicated something entirely different than the warrant.
 

 In
 
 Rios v State,
 
 901 SW2d 704, 705 (Tex App, 1995), the application for the search and arrest warrant described the place to be searched as
 

 [a] wood frame house located at 815 Agarita Street, Junction, Kimble County, Texas, occupied by Tony Rios Sr.
 

 The warrant, however, described the place to be searched as
 

 the suspected vehicle described in the affidavit.
 
 [Id.
 
 at 706.]
 

 An officer conducting the search testified that he did not read the warrant but relied on the affidavit attached to the warrant, which described the location at Agarita Street. The person who typed the warrant
 
 *153
 
 testified that the warrants were prepared on a computer and that she inadvertently left “vehicle” on the warrant instead of inserting the word “premises.” She testified that the warrant form was on the computer and that the warrant prepared before the one in question had been for a vehicle search. When the warrant form was printed she did not proofread the warrant and failed to change the word “vehicle” to “premises.” She also testified that the difference between vehicle and premises was a clerical error.
 

 The court, relying on cases discussing typographical errors in search warrants, held that
 

 when a search warrant contains a typographical error in the description of the place to be searched and the warrant incorporates the supporting affidavit which contains a correct description of the place to be searched, the trial court does not err in refusing to suppress the evidence seized during the search. We fail to see any Fourth Amendment benefit to be derived from suppressing this evidence.
 
 [Id.
 
 at 708.]
 

 In addition, foreign case law is generally consistent in holding that where an officer with knowledge of the premises to be searched applies for and executes the warrant, a mistaken search is unlikely and, therefore, the warrant is not constitutionally defective. See, e.g.,
 
 People v Rodriguez,
 
 254 AD2d 95; 680 NYS2d 2 (1998) (the affidavit in support of the warrant application listed the correct address three times and the officer who both applied for and executed the warrant had personal knowledge of the place to be searched, making it inconceivable that he would have searched a premises more than one hundred blocks away as a result of an obvious typographical error);
 
 United
 
 
 *154
 

 States v Durk,
 
 149 F3d 464, 466 (CA 6, 1998);
 
 Lyons v Robinson,
 
 783 F2d 737, 738 (CA 8, 1985).
 

 Applying these principles to the present case, we conclude that the description in the affidavit of the property to be searched, as well as the relevant information known by the executing officers, can be relied on to validate the search warrant. First, the affidavit, which was attached to the search warrant, accurately described the premises to be searched. Second, the executing officer was also the affiant and personally knew which premises were intended to be searched. Third, surveillance officers remained at defendant’s residence while the search warrant was being obtained. Fourth, the premises that were intended to be searched were, in fact, actually searched. Under these circumstances, no reasonable probability existed that the officers would search the wrong premises as a result of the inaccuracy in the search warrant.
 

 Defendant also contends that the trial court abused its discretion by excluding the testimony of William Parkman, Jr. Defendant sought to call Parkman, a retired officer of the Wayne County Sheriff’s Department and a professor, as an expert on police methods to challenge the methods and procedures used by the police officers in the investigation and arrest of defendant. Because defendant did not make an offer of proof at trial regarding the substance of Parkman’s excluded testimony, MRE 103(a)(2), we are unable to conclude that the exclusion of Parkman’s testimony affected defendant’s substantial rights. MRE 103(a).
 

 Next, defendant contends that the trial court pierced the veil of judicial impartiality when it informed the jury that defense witness Golden Gib
 
 *155
 
 son’s testimony was not the “best evidence” regarding the amount of cash defendant earned as a result of business transactions with Gibson. Defendant introduced the testimony of Golden Gibson in an attempt to show that the $14,000 found in defendant’s house was not derived from illegal drug dealing but rather from a business relationship with Gibson. When defense counsel questioned Golden Gibson regarding the amount of money defendant earned as a result of the business relationship, the prosecutor objected to the witness’ use of a “guess” to answer the question. The trial court then indicated that “the best evidence would be the records showing it,” but nonetheless allowed the witness to testify that through the sales of various cars defendant earned approximately $14,000 in cash.
 

 Clearly, the evidence defendant sought to introduce was admitted despite the trial court’s belief that the best evidence of the sales transactions would be records of the transactions. Defendant contends that the trial court’s comments would be viewed by the jury “not as a technical evidentiary ruling, but as a directive to them not to believe this witness’s testimony,” and that the comments influenced the jury to the detriment of defendant’s case.
 

 After a thorough review of the colloquy regarding Gibson’s testimony, we cannot conclude that the trial court’s comments pierced the veil of judicial impartiality.
 
 People v Sterling,
 
 154 Mich App 223, 228; 397 NW2d 182 (1986). Because the trial court was making a legal ruling regarding the admissibility of evidence, it is unlikely that the jury viewed the trial court’s remarks as comments regarding the credibility of the
 
 *156
 
 witness or as evidencing partiality on the part of the court.
 

 Next, defendant asserts that the trial court clearly erred in determining that defendant was not entrapped. Michigan courts use the objective test of entrapment.
 
 People v Juillet,
 
 439 Mich 34, 53; 475 NW2d 786 (1991). The objective test focuses on the propriety of the government’s conduct that resulted in the charges against the defendant rather than on the defendant’s predisposition to commit the crime.
 
 People v Patrick,
 
 178 Mich App 152, 153-154; 443 NW2d 499 (1989). The question is whether the actions of the police were so reprehensible under the circumstances that the court should refuse, as a matter of public policy, to permit the conviction to stand.
 
 People v Rezendes,
 
 164 Mich App 332, 334; 416 NW2d 436 (1987). Entrapment occurs when (1) the police engage in impermissible conduct that would induce a person situated similarly to the defendant and otherwise law abiding to commit the crime, or (2) the police engage in conduct so reprehensible that it cannot be tolerated by the court.
 
 People v Ealy,
 
 222 Mich App 508, 510; 564 NW2d 168 (1997).
 

 Defendant asserts that entrapment occurred under the second criterion; that is, that the government conduct was reprehensible. Under the second criterion, entrapment can be established if the police conduct is so reprehensible that it cannot be tolerated regardless of its relationship to the crime.
 
 People v Fabiano,
 
 192 Mich App 523, 531-532; 482 NW2d 467 (1992).
 

 Here, defendant claimed that the police engaged in reprehensible conduct by “creating an unacceptable danger that a crime would be manufactured” and by failing to supervise and control Sumner’s activities.
 
 *157
 
 Essentially, defendant’s argument is that Sumner was motivated to plant the drugs on defendant and in defendant’s house and that the police did nothing to ensure that such drugs were not planted. However, defendant failed to present any credible evidence that Sumner planted any drugs on defendant or in defendant’s house. Sumner was not observed entering defendant’s home, and all of the witnesses with the exception of Charles Suddeth denied seeing Sumner hand anything to defendant. Further, evidence was presented that the police did exert control over the informant. Officer Gonzalez telephoned Sumner and told him that a drug transaction needed to be arranged for that day. The police maintained surveillance of Sumner, Sumner’s home, and defendant’s home throughout the day and observed Sumner’s activities. Simply put, no evidence was presented that Sumner engaged in any reprehensible conduct that could be attributed to the police, or that the police engaged in reprehensible conduct. We are not left with a firm conviction that the trial court erred in finding that no entrapment occurred.
 

 Last, defendant contends that the destruction of the written agreement between police and Scunner resulted in the loss of exculpatory evidence. He claims that the agreement would have shown that Sumner was acting as an agent of the police and that defendant was the target of the agreement.
 

 At the entrapment hearing, testimony was presented that the police presented the informant with a form agreement early in negotiations. The form agreement required the informant to provide three targets for the officers to arrest. The provision for naming the targets remained blank on the form. When
 
 *158
 
 the police and Sumner agreed that Sumner had to procure only one target, the form agreement was never filled in and was never signed and, therefore, was destroyed. The verbal agreement reached between the police and Sumner was never reduced to writing. No evidence was presented to support a finding that the agreement contained any exculpatory evidence that could have affected the judgment of the jury. Further, both the police and Sumner testified regarding the contents of the agreement and it was established that Sumner was acting on behalf of the police and that defendant was the target of the agreement. Defense counsel thoroughly cross-examined the witnesses regarding the agreement. Consequently, we cannot discern how defendant was prejudiced by the destruction of the agreement.
 

 Affirmed.
 

 [1]
 

 The premises described on page four was the subject of a prior search warrant prepared on the computer.