*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
February 1, 2022

v

No. 351579
Wayne Circuit Court
LC No. 19-005017-01-FH

GEORGE ANDREW DORROUGH,

Defendant-Appellant.

Before: GLEICHER, C.J., and K. F. KELLY and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant, George Andrew Dorrough, appeals as of right his jury trial convictions of possession with intent to deliver less than 50 grams of cocaine, MCL 333.7401(2)(a)(*iv*), being a felon in possession of a firearm (felon-in-possession), MCL 750.224f, being a felon in possession of ammunition (felon-in-possession of ammunition), MCL 750.224f(6), and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced as a fourth offense habitual offender, MCL 769.12, to serve 10 years' imprisonment for felony-firearm and two years' probation for possession with intent to deliver, felon-in-possession, and felon-in-possession of ammunition. This case arises from a raid on a drug house executed by the Major Violators Section of the Detroit Police Department (DPD) which uncovered a gun and various drug paraphernalia. We affirm.

## I. FACTUAL BACKGROUND

This case arises from a search warrant executed at a house in Detroit on June 19, 2019, by the Major Violators Section of the Detroit Police Department. The warrant, which included a photograph of the house, described it as "a 2 story single family dwelling." When the police arrived, several people were out on the front porch, and the police secured them before entering the house. The officers then secured the house and searched it to ensure that no additional people were inside. The officers had their body cameras attached to the vests that they wore while securing the house, and after the house was secured, every officer deactivated their cameras and removed their vests. Accordingly, while there is footage of the team's arrival at the residence and of the officers securing the interior of the house, there is no footage of the actual search.

-1-

Several police officers testified about the deactivation of the body cameras. Officer Leo Rhodes explained that the "bodycamera [sic] is on a vest, an entry vest that we wear. And once that entry vest comes off, it goes into the van, into our raid van with the camera on it." Officer Rhodes admitted during cross examination that he was not familiar with the DPD's body camera policy. Sergeant Jeffrey Banks testified that they deactivated the cameras after the house was cleared because it would have been difficult to execute the search while wearing the vests. Officer Alanna Mitchell testified that "[w]hen you don't have direct contact with the person, you are allowed to cut your camera off," but she did not know where the policy manual said this. As will be discussed below, the policy manual does not support this interpretation. Officer Eric Maxwell testified that he turned off his camera prior to talking with defendant because defendant asked him to do so, and Officer Maxwell incorrectly claimed that this decision was consistent with the policy.

During the search, the police uncovered several empty "lotto papers" and several empty ziploc bags, both of which are commonly used to package narcotics. The police also found 24 individual ziploc bags that contained cocaine. In the back bedroom, the police found male clothing, male shoes, an air mattress, and a uniform shirt for "MPW" that said "George"[1] on it. The police also found a key on defendant's person when they searched him, and Officer Leo Rhodes testified that this key worked in the house's front door. Officer Eric Maxwell attempted to interrogate defendant while the house was being searched. Officer Maxwell testified that defendant "voluntarily" gave biographical information, including his place of employment, but that he declined to answer questions about what was found at the home.

At the time of the trial, the Major Violators Section of the Detroit Police Department was under investigation by both the FBI and DPD Internal Affairs for various allegations of corruption. However, there was no evidence that any of the officers involved in this case were under investigation. At trial, defendant attempted to admit evidence pertaining to this investigation and to question the officers about it in order to undermine their credibility and establish why they deactivated their body cameras. However, the court concluded that this evidence was inadmissible. The jury found defendant guilty, and defendant subsequently filed a motion seeking a new trial and an evidentiary hearing. Defendant raised various claims of ineffective assistance of counsel and supported these claims with a handwritten statement. The court denied defendant's motion, and this appeal followed.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first argues that he received ineffective assistance of counsel, asserting that trial counsel failed to move to suppress evidence found after the execution of an allegedly-defective search warrant, failed to investigate certain evidence, was unprepared for trial, and failed to pursue a plea agreement. We disagree.

---

[1] Defendant's first name is George.

A.  STANDARDS OF REVIEW AND GOVERNING LAW

Claims of ineffective assistance of counsel present mixed questions of fact and law. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). Factual findings are reviewed for clear error and legal conclusions are reviewed de novo. *Id*. Because the trial court has not held an evidentiary hearing, we generally limit our review to mistakes that are apparent from the record. *People v Riley*, 468 Mich 135, 139; 659 NW2d 611 (2003). However, in the context of determining whether remand for a *Ginther*[2] hearing is warranted, this we will consider evidence presented by defendant even if it is not part of the record. See *People v Moore*, 493 Mich 933, 933; 825 NW2d 580 (2013).

"To prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability exists that the outcome of the proceeding would have been different but for trial counsel's errors." *Head*, 323 Mich App at 539 (quotation marks and citation omitted; alteration removed). "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Traver*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019).

B.  FAILURE TO FILE A MOTION TO SUPPRESS

Defendant argues that his trial counsel erred by failing to file a motion to suppress the evidence found during the execution of the search warrant because the warrant itself was defective. We disagree.

Defendant argues that the search warrant failed to describe with particularity the place and people to be searched because it incorrectly described his clothing. The search warrant indicated that defendant was expected to be wearing a blue shirt and black pants, but that was not what he was wearing. This argument is clearly without merit because, as was noted in boldface type by the warrant itself,[3] defendant could simply have changed his clothes before the warrant was executed.

Defendant also argues that the search warrant failed to describe with particularity the place and people to be searched because it incorrectly described the house as a single-family unit. The Fourth Amendment to the United States Constitution only authorizes search warrants "particularly describing the place to be searched . . . " US Const, Am IV. A substantially similar provision can be found in the Michigan Constitution. Const 1963, art 1 § 11.

> [T]he test for determining the sufficiency of the description of the place to be searched is (1) whether the place to be searched is described with sufficient

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] The warrant stated in bold, "Note: It is a common occurrence in the narcotics trade for sellers to change and or change clothing."

particularity to enable the executing officer to locate and identify the premises with reasonable effort, and (2) whether there is any reasonable probability that another premises might be mistakenly searched. The requirement is designed to avoid the risk of the wrong property being searched or seized. [*People v Hampton*, 237 Mich App 143, 150-151; 603 NW2d 270 (1999) (quotation marks and citations omitted).]

When this test is applied to the facts currently before this Court, it is clear that the particularity requirement was satisfied. The search warrant provided the house's address, a photograph of the house, and a detailed description of the house. The only alleged error contained in the warrant was the statement that the house was a "single family dwelling" when it apparently was a multi-family dwelling. Common sense and experience suggest that it is sometimes difficult to tell whether a house is a multi-family dwelling, and the photograph attached to the warrant suggests that was the case here. From the outside the police had no way of knowing that it was not a single-family dwelling. This error was insufficient to nullify the warrant because the description as a whole enabled the officers "to locate and identify the premises" and there was very little probability that the description would result in a different house being mistakenly searched. *Hampton*, 237 Mich App at 150-151. Therefore, the particularity requirement was satisfied, and a motion to suppress would have been futile. Defense counsel is not ineffective for failing to pursue a futile motion. *People v Goodin*, 257 Mich App 425, 433; 668 NW2d 392 (2003). No factual development is necessary to resolve this argument.[4]

## C. FAILURE TO INVESTIGATE AND PRESENT EVIDENCE

Defendant argues that his trial counsel erred by failing to investigate and present evidence pertaining to whether defendant's fingerprints were present on the gun that was seized in the home, by failing to present evidence that the key recovered on defendant's person did not fit in one of the house's interior doors, and by failing to request additional body camera footage. We disagree.

"Counsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). (quotation marks and citation omitted). "[A] sound defense strategy cannot follow an incomplete investigation of the case when the decision to forgo further investigation was not supported by reasonable professional judgment." *Id*. at 55. "Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). The cross-examination of witnesses is likewise a matter of trial strategy. *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008). However, "[c]ounsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately

---

[4] Defendant also alleges that a controlled buy never occurred and states that "this goes to the basis for the search warrant and why a motion to suppress was needed." However, defendant did not make an offer of proof, he did not submit any evidence or affidavits that supports this assertion, and he did not name any witnesses who could have testified that a controlled purchase never occurred. All this Court has been supplied on this issue is defendant's bare assertion that a controlled purchase never happened, and that is insufficient to justify a remand to explore this issue.

impeaching the witnesses against the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014).

Defendant argues that his trial counsel erred by failing to request expert analysis of the gun recovered during the search warrant to determine if defendant's fingerprints were on it. Sergeant Jeffrey Banks testified that the gun was sent into the lab for fingerprint testing and that he never received a report. Defendant argues that defense counsel should have insisted that fingerprint analysis be performed on the gun. Defendant has failed to make an offer of proof concerning what the testing would have revealed and can only speculate that his fingerprints would not have been detected. Moreover, it appears that defense counsel's approach was a reasonable strategy. Defense counsel could reasonably have concluded that pursuing testing of the gun would have exposed defendant to substantial risk while only presenting a possibility of a marginal benefit. Given that the gun was found in the home where defendant appeared to be living, there was a realistic possibility that defendant's fingerprints could be found on the gun, and this would have virtually guaranteed that defendant would be convicted of the weapons charges. Conversely, evidence that defendant's fingerprints were not found on the gun would have provided only marginal benefit, because the prosecution's theory was constructive rather than actual possession. Finally, the fact that the gun was not tested arguably helped defendant because it supported his theory that the policework performed in this case was at best sloppy and at worst corrupt. Indeed, defense counsel attempted to undermine police credibility by cross-examining Sergeant Banks about the fact that fingerprint testing was not performed on the gun, and he would not have been able to do this if the testing had been performed.

Defendant argues that defense counsel failed to present evidence that the key recovered on defendant did not fit in an interior door. However, multiple witnesses testified that the key in fact *did* fit in the door and defendant has failed to explain how defense counsel could have impeached this testimony. Moreover, defense counsel attempted to question Officer Alanna Mitchell about this key, but she denied having memory of having ever been given a key. Finally, defendant has not provided an offer of proof of any witness who could have established that any interior doors to the house had locks to which the key did not fit.

Defendant also suggests that his trial counsel erred by failing to request body camera footage. However, defendant has failed to make an offer of proof that would justify an evidentiary hearing. Defendant has not specified whose body camera footage he did not receive, what this footage would have showed, or how it would have helped him. Moreover, four body camera videos were presented at trial, and two of them were admitted by defendant.

D. FAILURE TO PREPARE FOR TRIAL

Defendant argues generally that his trial counsel was not prepared for trial. However, defendant has failed to make an offer of proof that would have justified the trial court in granting his request for an evidentiary hearing. Defendant failed to specify what his attorney should have done to be better prepared, what mistakes were made as a result of his lack of preparation, or how more preparation would have resulted in a different outcome. Moreover, the record before this Court suggests that defense counsel in fact was highly prepared for trial as he thoroughly cross-examined the prosecution's witnesses, presented multiple witnesses on behalf of defendant, raised numerous objections to the prosecution's evidence, moved for a directed verdict, and was prepared

to potentially present evidence that the Major Violator's Section of the Detroit Police Department was being investigated for corruption.

### E. REPRESENTATION DURING PLEA NEGOTIATIONS

Defendant argues that defense counsel erroneously failed to pursue a plea agreement on his behalf. We disagree.

"As at trial, a defendant is entitled to the effective assistance of counsel in the plea-bargaining process." *People v Douglas*, 496 Mich 557, 591-592; 852 NW2d 587 (2014). In this context, the defendant must still satisfy the test articulated in *Strickland*. *Id*. at 592. Defense counsel's duty is to "properly advise defendant regarding the nature of the charges or the consequences of the guilty plea and the possible defenses to the charges to which the defendant is pleading guilty, so defendant has the ability to make an intelligent and informed choice from among his alternative courses of action." *White*, 331 Mich App at 148 (quotation marks and citation omitted). To establish prejudice "[i]n the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Id*. at 163.

The record before this Court is adequate to reject defendant's argument that his trial counsel failed to pursue a plea deal without additional factual development. First, a plea offer was read into the record at defendant's arraignment that would have resulted in the dismissal of three counts as well as the habitual offender notice and the second offense notice. Then, at a subsequent pretrial conference, defense counsel stated on the record that defendant was not interested in a plea agreement and had insisted on going to trial. Defendant now asserts that "no one had conferred with Mr. Dorrough about the offer and whether or not he understood." However, defendant has not made an offer of proof concerning what he discussed with defense counsel, how many discussions they had, what he was told about the offer, why the advice he was given resulted in the offer's rejection, or what should have been said to persuade him to accept the offer. Moreover, defendant's assertion that no one conferred with him about the offer directly contradicts the statement his attorney made at the pretrial conference.[5]

### III. FAILURE TO PRESERVE EVIDENCE

Defendant next argues that his rights were violated by the police officers' deactivation of their body cameras in violation of DPD body-camera policy. We agree that the deactivation of the cameras violated the DPD's policy. Furthermore, because the Major Violators Section of the DPD was under investigation for corruption, deactivating the cameras reflected poor judgment. However, under the particular facts of this specific case, we are unable to conclude that defendant was prejudiced as a result of the deactivation of the body cameras.

---

[5] Because the record before us is sufficient to resolve these arguments, it is not necessary for the trial court to conduct an evidentiary hearing, and the trial court did not abuse its discretion by denying defendant's motion to hold one.

## A. ISSUE PRESERVATION AND STANDARDS OF REVIEW

An alleged violation of a criminal defendant's due process rights presents a constitutional question and is reviewed de novo. *People v Wilder*, 485 Mich 35, 40; 780 NW2d 265 (2010). Defendant failed to preserve his argument that the prosecution violated *Brady v Maryland*[6] because, while defendant moved for a new trial, the improper suppression of evidence was not raised in this motion. *People v Burger*, 331 Mich App 504, 516; 953 NW2d 424 (2020). Defendant likewise failed to preserve his argument that the prosecution violated *Arizona v Youngblood*[7] because it was not raised in the trial court. *People v Heft*, 299 Mich App 69, 78; 829 NW2d 266 (2012). Accordingly, these issues are reviewed for plain error affecting substantial rights. *Burger*, 331 Mich App 516. A plain error occurs if three requirements are "met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (citation omitted).

## B. *BRADY V MARYLAND*

Defendant argues that evidence was wrongfully suppressed in violation of *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed2d 215 (1963) because the police deactivated their body cameras prior to searching the home. We disagree.

It is well-settled that the prosecution has an affirmative duty to disclose evidence that is favorable to the defense—whether because it is exculpatory or could serve to impeach a prosecution witness—if the evidence is material either to guilt or punishment. *Brady*, 373 US at 87; *Kyles v Whitley*, 514 US 419, 432-433; 115 S Ct 1555; 131 L Ed2d 490 (1995). To establish a *Brady* violation, the defense must show: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). Defendant has failed to establish that the prosecution suppressed body camera evidence, because it is undisputed that the particular body-camera evidence in question never existed.

## C. *ARIZONA V YOUNGBLOOD*

Defendant argues that the wrongful deactivation of police body cameras constituted a violation of his due process rights under *Arizona v Youngblood*, 488 US 51, 57-58; 109 S Ct 333; 102 L Ed2d 281 (1988). We disagree. Although deactivating the cameras was unwise, the facts of this particular case do not satisfy the requirements of *Youngblood*.

"A criminal defendant can demonstrate that the state violated his or her due process rights under the Fourteenth Amendment if the state, in bad faith, failed to preserve material evidence that might have exonerated the defendant." *Heft*, 299 Mich App at 79 (citing *Youngblood*, 488 US at

---

[6] *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed2d 215 (1963).

[7] *Arizona v Youngblood*, 488 US 51, 57-58; 109 S Ct 333; 102 L Ed2d 281 (1988).

57-58). For such a claim to warrant reversal, "a defendant must prove that the missing evidence was exculpatory or that law enforcement personnel acted in bad faith." *People v Hanks*, 276 Mich App 91, 95; 740 NW2d 530 (2007). "Defendant bears the burden of showing that the evidence was exculpatory or that the police acted in bad faith." *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992). "If the defendant cannot show bad faith or that the evidence was potentially exculpatory, the state's failure to preserve evidence does not deny the defendant due process." *Heft*, 299 Mich App at 79.

Because defendant has failed to establish that he was deprived of exculpatory evidence, we must use the framework established for cases where the defendant was deprived of potentially exculpatory evidence.

In such a case, the defendant must show: (1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means. [*United States v Jobson*, 102 F3d 214, 218 (CA 6, 1996)]

As discussed, the officers deactivated their body cameras, and therefore failed to record the entirety of their search of the house and interactions with defendant, on the belief that they were permitted to do so. The Detroit Police Department body camera policy provides in relevant part:

**304.6-1 PURPOSE**

The purpose of this directive is to establish guidelines and procedures governing the use of body-worn camera (BWC) systems by department members and the preservation of the digital media created by such equipment.

\* \* \*

**304.6-3 PROCEDURE**

1) All members at BWC equipped commands who have citizen interactions in the daily performances of their duty are mandated to wear a body-worn camera.

\* \* \*

**304.6-3.1 When to Activate Body-Worn Cameras**

The BWC shall be activated prior to initiating, or as soon as practical after initiating the following police actions:

1) Except as otherwise provided in this policy, members shall activate their body-worn cameras to record all contacts with citizens in the performance of his/her official duties (i.e. calls for service, vehicle stops, *execution of search and/or arrest warrants*, observed events, and casual encounter).

2) Once a body-worn camera is activated, the device shall remain on until the event is completed in order to ensure the integrity of the recording.

3) If a member fails to activate his/her body-worn camera, fails to record the entire event, or interrupts the recording, the member shall document on his/her Activity Log why the recording was not made, interrupted, or terminated.

4) If a member purposely de-activates his/her body-worn camera without justified cause, he/she may be subject to disciplinary action.

\* \* \*

**304.6-3.2 When to Stop Recording**

Whether a member must comply with a citizen's request to stop recording with a body-worn camera depends on the location, whether the member is at the location pursuant to a valid search warrant, and whether or not exigent circumstances exist. The following rules apply:

\* \* \*

2) When a member is in an area where an individual has a reasonable expectation of privacy (such as a private home), pursuant to a valid search warrant, and the individual objects to the recording, the member *shall not* stop recording.

\* \* \*

5) When a member is taking a witness statement from a victim of an alleged rape, other victim of a violent crime, or if there is a rational belief by that member that the recording would place the witness in danger of harm. This discretion is solely left to the responding officer.

6) Any interruption of a BWC recording under this section must be properly documented as set forth in Section 304.6-3.1(3) of this Policy. [Emphasis added.]

Contrary to the officers' stated beliefs, every instance in which the police officers turned off their body cameras constituted a violation of DPD Policy. The execution of a search warrant is a situation during which the policy specifically requires that officers use their body cameras. While the officers in this case apparently felt it was appropriate to deactivate their cameras after the house was cleared because it is difficult to search while wearing a vest, the policy specifically requires that the cameras "remain on until the event is completed in order to ensure the integrity of the recording." Officer Alanna Mitchell testified that it was permissible for her to turn off her camera when not having direct contact with someone, but this testimony was inconsistent with the official policy. Officer Eric Maxwell testified that it is not required to have the body camera on while taking a statement and that it should be turned off if the person who is giving a statement so requests. The policy directly contradicts this view, because it specifically prohibits officers from complying with a request to deactivate the camera when in a private home pursuant to a search warrant.

The prosecution argues that Officer Maxwell did not violate department policy when he deactivated his camera because the policy allows the camera to be deactivated "if there is a rational belief by that member that the recording would place the witness in danger of harm." However, Officer Maxwell never mentioned this provision, and he never claimed that his decision to deactivate the camera was motivated by a desire to protect defendant from *harm*. Rather, Officer Maxwell suggested that he deactivated his camera to protect defendant's privacy. The prosecution failed to explain how recording defendant's statement could have placed him in danger. Moreover, even if Officer Maxwell did deactivate his camera because he believed defendant was in danger, he violated the policy by failing to document why he deactivated his camera, as is required by multiple provisions of the policy. Finally, the prosecution's argument that Officer Maxwell was protecting defendant's safety ignores that the majority of the officers who deactivated their cameras were not speaking with defendant when they did so.

Furthermore, defendant has made no offer of proof concerning what the footage would have showed or how this footage could have helped him. Indeed, defendant has not suggested that the police planted any of the evidence that was recovered or otherwise engaged in misconduct. We do not condone the officers' conduct, and we note that deactivation of the cameras in violation of department policy was, in retrospect, a poorly-considered decision at a time when the officers' unit was under investigation. However, a bad decision is not necessarily bad faith. On this record, we are unable to find that the officers' conduct rose beyond carelessness, misjudgment, or possibly inadequate training. Notably, the officers turned off their cameras *before* beginning the search for contraband, at which time they had no reason to suspect that by doing so they would be preventing or hindering the discovery of exculpatory evidence. Furthermore, the officers did not deactivate their cameras during a particular event only to reactivate them later, which would suggest a desire to conceal what occurred during that event. The record in this case does not indicate that the officers deactivated their cameras because they anticipated a need to conceal evidence. Accordingly, defendant is not entitled to relief under *Youngblood*.

## IV. SELF-INCRIMINATION

Defendant next argues that he was deprived of his right against self-incrimination because the police continued to interrogate him after he invoked his right to remain silent, and the prosecutor improperly referred to defendant's decision to invoke his right to remain silent. We disagree with the former, and although we agree that the prosecutor did make improper references, we are unable to find that those improper references violated his substantial rights.

### A. ISSUE PRESERVATION AND STANDARDS OF REVIEW

In general, we review constitutional questions de novo. *People v Wiley*, 324 Mich App 130, 150; 919 NW2d 802 (2018). However, defendant failed to preserve this issue by raising it in the trial court. *People v Green*, 322 Mich App 676, 681; 913 NW2d 385 (2018). Unpreserved constitutional issues are reviewed for plain error affecting substantial rights. *People v Stokes*, 333 Mich App 304, 307; 963 NW2d 643 (2020).

## B.  POLICE INTERROGATION

"[E]very person subject to interrogation while in police custody must be warned, among other things, that the person may choose to remain silent in response to police questioning." *People v Shafier*, 483 Mich 205, 212; 768 NW2d 305 (2009).  "Once a suspect invokes his right to remain silent . . . , police questioning must cease unless the suspect affirmatively reinitiates contact." *People v Tanner*, 496 Mich 199, 208; 853 NW2d 653 (2014).  The right to remain silent can be asserted at any time, but the assertion of this right "must be unequivocal." *People v Henry (On Remand)*, 305 Mich App 127, 145; 854 NW2d 114 (2014).  After the right has been asserted, "the police must 'scrupulously honor' the defendant's request." *Id.* (citation omitted).  Statements made by a defendant during an interrogation after the defendant invoked the right to remain silent are inadmissible in court.  *People v Adkins*, 259 Mich App 545, 564; 675 NW2d 863 (2003).

The record does not support defendant's argument that the police continued to interrogate him after he invoked his right to remain silent.  To the contrary, the only evidence in the record probative of this issue was Officer Maxwell's testimony, and Officer Maxwell testified that he began his conversation with defendant by reading him his rights, that defendant voluntarily offered biographical information such as his place of employment, that defendant invoked his right to remain silent when he began to receive questions pertaining to the crimes of which he was suspected, and that the interrogation then ceased.  Therefore, defendant has presented us with no basis upon which to conclude that the trial court admitted evidence of statements that defendant made to the police after invoking his right to remain silent.

## C.  REFERENCES TO INVOCATION OF RIGHT

A defendant's invocation of his right to remain silent cannot be used as evidence against him at trial.  *Shafier*, 483 Mich at 213-214.  However, it is permissible to reference the fact that the right to remain silent was invoked if "the reference was so minimal that silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference." *Id.* at 218 (quotation marks, citation, and alteration omitted).  Rather, the prosecution is "not allowed to undertake impeachment on or . . . to call attention to" the defendant's silence.  *Greer v Miller*, 483 US 756, 764-765; 107 S Ct 3102; 97 L Ed2d 618 (1987).

In this case, references were made to defendant's choice to remain silent during the direct examination of Officer Maxwell:

> *Q.*  Okay.  And do you recall if the defendant made any statements?
>
> *A.*  He did not make a statement with regards to the situation that occurred that day.  But he did voluntarily give me information with regards to where he work [sic] at, where he stays, and things like that I believe.
>
> \*   \*   \*
>
> *Q.*  Okay.  And, officer, did you write this the writing that's on this form or did the defendant write this?
>
> *A.*  Yes, I wrote those.

-11-

*Q.* So when it says "refused" is that in your writing?

*A.* That was in my writing, yes. He refused to make a statement with regards to the incident that occurred that day.

*Q.* And then there's a signature line that also says "refused". Would that be—why does that say refused for his signature?

*A.* Once it came down to asking in regards to the incident, he didn't want to make any statements in regards to it. So he refused to sign paperwork or initial anything in regards to him even having the statement form in front of him.

Additional references were made during the cross examination of Officer Maxwell:

*Q.* Okay. Now you asked him—you read him his rights?

*A.* Correct.

*Q.* And then after he refused to make a statement, you then asked him further questions?

*A.* No. It's in exact order, and the order you're going through is not the way it actually occurs.

*Q.* Okay. So what is the order that it goes in?

*A.* So I advise him of his rights.

*Q.* Right.

*A.* The very next page of that I'm asking information with regards to family members, where he works at things of that nature. The next page after that is the same exact thing again his name, last name, date of birth, where he stays at, and his employer as well.

After that, I get into the question statements where I ask him question and answer. I write the question out, and normally they write the answer out in their own handwriting, and I have them initial next to it.

*Q.* Okay. So you read him the constitutional rights?

*A.* Correct.

*Q.* And he exercised those?

*A.* In regards to what?

*Q.* He refused to cooperate?

*A.* No, that's not what he did.

I read him his rights, advised him of them. After that we went in regards to where he works at, date of birth, and things of that nature. He did not refuse to make a statement until he realize he was going to jail.

The particular references that were made during Officer Maxwell's cross-examination clearly did not violate defendant's rights because the comments were elicited by defense counsel in an unsuccessful attempt to get Officer Maxwell to admit to having continued questioning defendant after the right was invoked. However, the references made during Officer Maxwell's direct examination were inappropriate. The prosecutor repeatedly elicited direct references to the fact that defendant invoked the right to remain silent, and the trial court failed to craft a specific curative instruction to prevent the jury from using the references to infer guilt. The prosecutor's repeated inquiries into whether defendant made a statement to the police were impliedly for the purpose of making defendant appear uncooperative and as though he had something to hide. This is precisely what is disallowed and a violation of defendant's rights. *Shafier*, 483 Mich at 214.

However, defendant has failed to establish that this error affected the outcome of the proceeding. This was only a brief exchange with one witness who testified in the middle of defendant's trial. No one explicitly suggested that defendant's silence implied guilt. Defendant's silence was not mentioned during opening statements or closing arguments. Finally, this error had no connection to the evidence that most supported defendant's conviction: the facts that drugs were found in the home, that a scale and bags were found in the home, and that it appeared as though defendant was living in the home. For all these reasons, it cannot be said that this inappropriate reference to defendant's invocation of his right to remain silent affected the outcome of the trial.

## V. EXCLUSION OF EVIDENCE PERTAINING TO INVESTIGATION

Defendant finally argues that he was denied a fair trial because the court excluded evidence that the Major Violators Section of the Detroit Police Department was being investigated by the FBI and DPD Internal Affairs due to allegations of corruption. We disagree.

### A. STANDARD OF REVIEW

Preserved evidentiary challenges are reviewed for abuse of discretion. *People v Thorpe*, 504 Mich 230, 251; 934 NW2d 693 (2019). "The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls 'outside the range of principled outcomes.' A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id.* at 251-252 (quotation marks and citation omitted).

### B. ANALYSIS

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "Credibility of a witness is almost always at issue, and, thus, evidence bearing on that credibility is always relevant." *People v Spaulding*, 332 Mich App 638, 660; 957 NW2d 843 (2020). MRE 403 provides that relevant "evidence may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

We presume for discussion, although we do not decide, that evidence of the ongoing corruption investigation would have been relevant to the credibility of the police officers. Nevertheless, the trial court reasonably found its probative value weak. Although there apparently had been one indictment, there had been no convictions arising from this investigation, and it involved mere allegations. More importantly, as discussed, there was no evidence that any of the officers involved in this case were implicated by this investigation. Finally, there was no evidence to suggest that the specific conduct for which the section was being investigated had been perpetrated against defendant in this case. On the other hand, evidence that the city's police department was allegedly involved in corrupt activities likely would be given undue weight by the jury and cause jurors to unfairly doubt the testimony with which it was presented. Therefore, the trial court did not abuse its discretion by declining to admit this evidence.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Kirsten Frank Kelly
/s/ Amy Ronayne Krause