*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

QUATRAIL TERELL SMITH,

        Defendant-Appellant.

FOR PUBLICATION
April 4, 2024
9:00 a.m.

No. 362114
Genesee Circuit Court
LC No. 2020-046462-FC

Before: RIORDAN, P.J., and CAVANAGH and GARRETT, JJ.

GARRETT, J.

The COVID-19 pandemic placed immeasurable, unexpected, and unprecedented stress on our court system. That stress included the suspension of jury trials, the resulting backlog of cases, and the inevitable delays in taking cases to trial. These delays affected everyone who makes up our justice system, but they uniquely affected criminal defendants, especially those incarcerated while awaiting trial. This case, like many others that our Court has confronted since the COVID-19 pandemic, involves a claimed violation of the constitutional right to a speedy trial. Defendant Quatrail Terell Smith was incarcerated for over two and a half years before a jury convicted him of three counts of first-degree murder, along with several firearm possession charges.

We hold that delays caused by the COVID-19 pandemic are not attributable to the prosecution when evaluating a speedy-trial claim. "The government simply cannot be faulted for a highly contagious and mutating virus." *United States v Pair*, 84 F4th 577, 589 (CA 4, 2023). While the length of the delay in this case creates a presumption of prejudice to Smith, nearly all the delay stemmed from emergency public-health measures taken to limit the spread of COVID-19, and the delay did not prejudice Smith's ability to defend against the charges. We therefore conclude that Smith's right to a speedy trial was not violated. We also find no merit to Smith's challenges to the jury instructions, the sufficiency of the evidence, and the imposition of court costs, as well as his pro se claims of ineffective assistance of counsel and prosecutorial misconduct. Accordingly, we affirm his convictions and sentences.

## I. BACKGROUND

Smith's convictions arise from the September 20, 2019 shooting deaths of Jo'Nie Vary, Deaijon Parker, and Antonio Colen. The prosecution's theory at trial was that the three victims met with Smith at a house in Flint to trade guns and, because several neighbors were outside on their front porches, the four men went to the back of the house to conduct their transaction. Jovana King, Smith's girlfriend, was sitting in her car in the driveway and waiting for Smith when she heard several gunshots. King moved from the passenger seat into the driver's seat of the car, preparing to leave, when Smith jumped into the car and they left together. King initially drove to a relative's home and then went home with Smith. Later that night, when Smith's brother stopped by, King saw Smith with a large amount of money and a gun.

Each of the victims died from multiple gunshot wounds. Two of the victims were found in the backyard, and the third victim was discovered inside a bedroom. Two of the victims were found in positions suggesting that they were trying to flee when they were shot. The pockets of one of the victims were turned out, and no money or weapons were recovered from any of the victims.

The day after the shooting, Smith was driving King's car with King and Smith's brother inside. A police officer noticed that the car matched the description of the car involved in the shooting, so the officer activated his lights to make a stop. Smith pulled over at a gas station, stopped at a pump, got out of the car, and walked toward the station. He initially ignored the officer's commands to stop but eventually turned around and returned to the driver's seat of the car. Before he was arrested, Smith attempted to hide a gun by giving it to his brother in the backseat, and he gave drugs to King. The police searched Smith's home and recovered $1,100 from a sweatshirt pocket. Investigators also discovered a gun linked to the shooting underneath a dog house at the home, and Smith's DNA was found on the gun.

At trial, Smith did not dispute that he met with the victims at the Flint house and that he shot the victims. But Smith argued that the evidence failed to show that the killings were premeditated or unjustified, and therefore, he should be acquitted of both first- and second-degree murder. Smith also requested jury instructions on self-defense and voluntary manslaughter, but the court declined to give them, finding that the evidence supported neither instruction.

The jury found Smith guilty of three counts of first-degree premeditated murder; carrying a concealed weapon (CCW); felon in possession of a firearm; and four counts of possession of a firearm during the commission of a felony (felony-firearm). The trial court sentenced Smith to life imprisonment without parole for the murder convictions, and shorter term-of-year sentences for the firearm convictions. Smith now appeals as of right.

## II. SPEEDY TRIAL

Smith first argues that he was deprived his right to a speedy trial.

Whether a defendant was denied his constitutional right to a speedy trial is a mixed question of fact and constitutional law. *People v Gilmore*, 222 Mich App 442, 459; 564 NW2d 158 (1997). We review the trial court's factual findings for clear error but evaluate questions of law de novo.

*Id.* "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008) (cleaned up). But on de novo review, we consider the issue independently, "with no required deference to the trial court." *People v Beck*, 504 Mich 605, 618; 939 NW2d 213 (2019).

Both the United States and Michigan Constitutions guarantee criminal defendants the right to a speedy trial. US Const, Am VI; Const 1963, art 1, § 20. "[A] defendant's right to a speedy trial is not violated after a fixed number of days." *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006). Rather, when evaluating a speedy-trial claim, the reviewing court is required to balance four factors: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id.* at 261-262.[1] "Following a delay of eighteen months or more, prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury." *Id.* at 262.

We begin with the length of delay. "The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *Id.* at 261. Smith's speedy trial clock began to run on September 21, 2019, when he was arrested. Because the length of the delay between his arrest and April 2022 jury trial was more than 30 months, prejudice is presumed. See *id.* at 262.

Next is the reason for delay. In assessing this factor, reviewing courts "may consider which portions of the delay were attributable to each party when determining whether a defendant's speedy trial rights have been violated and may attribute unexplained delays—or inexcusable delays caused by the court—to the prosecution." *People v Lown*, 488 Mich 242, 261-262; 794 NW2d 9 (2011) (cleaned up). Although delays and docket congestion "inherent in the court system" are "technically attributable to the prosecution, they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *Gilmore*, 222 Mich App at 460 (cleaned up).

After Smith's arrest, about five months passed before he was bound over to circuit court on February 13, 2020. The prosecution concedes that this time should be attributed to it, but with a neutral tint, because the delay in holding the preliminary examination stemmed from the complexity of the case and a codefendant's request for a competency evaluation.[2] The record reflects that one of the defendants was referred for a competency evaluation on October 21, 2019. The preliminary examination was later held over two days, January 16, 2020 and February 13, 2020. The adjournment between these dates was requested by the prosecution, as it was awaiting an autopsy report and the testimony of another witness. We generally agree that this period of

---

[1] These factors are often known as the *Barker* factors, as they were first announced by the United States Supreme Court in *Barker v Wingo*, 407 US 514, 530; 92 S Ct 2182; 33 L Ed 2d 101 (1972). Our Supreme Court first adopted the *Barker* factors in *People v Grimmett*, 388 Mich 590, 602-606; 202 NW2d 278 (1972), overruled on other grounds by *People v White*, 390 Mich 245, 258; 212 NW2d 222 (1973).

[2] Smith, King, and Smith's brother were all initially charged in this case.

about five months is attributable to the prosecution, but with some of the delay before the preliminary examination assigned a neutral tint and minimal weight. See *id*.

Once in circuit court, the first pretrial hearing occurred on May 11, 2020. By that point, of course, the COVID-19 pandemic had begun, altering criminal proceedings throughout the state. In March 2020, the Governor declared a state of emergency because of the onset of the pandemic. The Supreme Court, in response, issued Administrative Order No. 2020-1, effective March 15, 2020, and adopted emergency procedures in the state's court facilities. See 505 Mich xcix. Effective March 18, 2020, the Supreme Court imposed limits on trial court proceedings, limiting access to courtrooms to no more than 10 persons. Administrative Order No. 2020-2, 505 Mich cii. Beginning April 23, 2020, the Supreme Court delayed all jury trials until June 22, 2020, or until further order of the Court. See Administrative Order No. 2020-10, 505 Mich cxxxix.

As the trial court noted in its June 3, 2021 opinion denying Smith's second motion for a speedy trial, jury trials in the Genesee Circuit Court had barely occurred in the preceding 15 months. The trial court's thorough opinion explained how the COVID-19 pandemic was the primary reason for the delay in this case:

> The greatest delay in this matter, however, and the key reason that no trial has been conducted in Defendant's case, is the COVID-19 Pandemic. As of mid-March 2020, just a month after Defendant was bound over to circuit court, the 7th Judicial Circuit Court postponed jury trials indefinitely. In September 2020, two single jury trials were conducted involving defendants who had been incarcerated for much longer periods of time than Defendant. The trials used the circuit's sole double jury courtroom to accommodate social distancing and safe practices. Unfortunately, due to increased COVID-19 rates in Genesee County, the court was again closed to the public after completion of the second trial and no further jury trials have been conducted since. No other delay is supported in the record. Because neither the People nor Defendant have alleged a basis for any other delay, and this Court has not discovered any other causes for delay through its review of the record before it, this Court concludes that the reason for the significant delay in this case is the COVID-19 Pandemic.

The trial court's findings on this issue are unchallenged. At later hearings in the latter half of 2021, the trial court assured Smith that his trial was a priority given the length of his incarceration. Because of pandemic-related restrictions on the number of available courtrooms and the need to prioritize cases older than Smith's, however, the court could not schedule Smith's trial until January 25, 2022. For unknown reasons, the January trial date was moved to April 5, 2022, which is when Smith's trial began. We conclude that the period of delay from March 15, 2020 through January 25, 2022—about 22 months—was caused by the COVID-19 pandemic, whether because of mandated courtroom closures or the resulting backlog of cases that prevented Smith's case from quickly proceeding to trial. The last two or so months before Smith's trial are attributable to the prosecution, as it concedes, because the reason for this delay is unexplained. See *Lown*, 488 Mich at 261-262.

Remarkably, Smith's brief does not once mention the COVID-19 pandemic and its impact on court proceedings as a reason for delay. In any event, delays related to the pandemic—including

the suspension of trials, public-health measures limiting the number of trials, and the ensuing accumulation of cases awaiting trial—were the reason for nearly all the delay in this case. In several unpublished decisions, this Court has concluded that delays related to the COVID-19 pandemic are not attributable to the prosecution when evaluating a speedy-trial claim.[3] State and federal courts across the country have reached similar conclusions when reviewing speedy-trial claims.[4] And in the related context of Michigan's statutory 180-day rule, MCL 780.131,[5] we have held that delays caused by the pandemic should not be held against the government when determining whether dismissal is required. *People v Witkoski*, 341 Mich App 54, 57-58, 62-64; 988 NW2d 790 (2022).

We follow the overwhelming weight of authorities and hold that delays caused by the COVID-19 pandemic are not attributable to the prosecution for purposes of a speedy-trial claim. Unlike delays *inherent* in the court system which are attributable to the prosecution, *Gilmore*, 222 Mich App at 460, delays resulting from emergency public-health measures during an unprecedented global pandemic are anything but. See *State v Paige*, 977 NW2d 829, 839 (Minn, 2022) (distinguishing delays from "internal" factors such as docket congestion, "which weigh moderately against the state," from delays caused by "external" factors such as the death of a judge, which do not weigh against the state). And these pandemic-related delays in criminal proceedings across Michigan were neither unexplained nor inexcusable. See *Lown*, 488 Mich at 261-262. "To hold a trial amid the pandemic would have required that jurors, witnesses, counsel, and courthouse personnel act contrary to the advice of public health professionals and put themselves in harm's way." *Pair*, 84 F4th at 585. As the trial court explained in great detail, and the record confidently

---

[3] See, e.g., *People v James*, unpublished per curiam opinion of the Michigan Court of Appeals, issued May 18, 2023 (Docket No. 358574), pp 3-4; *People v Church*, unpublished per curiam opinion of the Court of Appeals, issued April 27, 2023 (Docket No. 359316), p 10; *People v Earls*, unpublished per curiam opinion of the Court of Appeals, issued March 23, 2023 (Docket No. 358401), pp 2-3. Unpublished decisions of this Court are not binding, but we may consider them for their persuasive value. *People v Cameron*, 319 Mich App 215, 221 n 2; 900 NW2d 658 (2017).

[4] See, e.g., *United States v Keith*, 61 F4th 839, 853 (CA 10, 2023) ("We choose to treat COVID-19 as a truly neutral justification—not favoring either side."); *United States v Snyder*, 71 F 4th 555, 578 (CA 7, 2023) ("[T]he pandemic-related delays in [the defendant's] case were justifiable and cannot fairly be attributed to the government."); *Vlahos v State*, 518 P3d 1057, 1072 (Wy, 2022) ("Delays due to COVID-19 pandemic are neutral because the pandemic was an extraordinary circumstance not attributable to either the State or [the defendant].") (cleaned up); *State v Paige*, 977 NW2d 829, 838 (Minn, 2022) ("[T]rial delays due to the statewide orders issued in response to the COVID-19 global pandemic do not weigh against the State."). Caselaw from other states and lower federal courts may also be considered persuasive. *People v DeRousse*, 341 Mich App 447, 456; 991 NW2d 596 (2022).

[5] Although not applicable here, the 180-day rule exists "to dispose of new criminal charges against inmates in Michigan correctional facilities; the rule requires dismissal of the case if the prosecutor fails to commence action on charges pending against an inmate within 180 days after the Department of Corrections (DOC) delivers notice of the inmate's imprisonment." *Lown*, 488 Mich at 246.

supports, "the extenuating circumstances brought about by the pandemic prevented the government from trying [Smith] in a speedy fashion." *United States v Keith*, 61 F4th 839, 853 (CA 10, 2023).

While ignoring the COVID-19 pandemic, Smith contends that the delay between arrest and trial was "mainly attributable" to the prosecution because of "incomplete discovery." There were discovery disputes in this case throughout the pretrial proceedings, but they were generally resolved during the pandemic-related delays. Smith has not shown that any issue involving incomplete discovery delayed the start of trial. In total, about seven or eight months of the delay in this case was attributable, neutral tint or otherwise, to the prosecution. The rest of the delay resulted from the COVID-19 pandemic and the well-established impact it had on the ability to hold trials in Genesee Circuit Court. See *United States v Walker*, 68 F4th 1227, 1238 (CA 9, 2023) ("The pandemic, not the prosecution, caused the delay."). Thus, the reasons for delay do not support Smith's speedy-trial claim.

The third factor is the assertion of the right to a speedy trial. "[F]ailure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker v Wingo*, 407 US 514, 532; 92 S Ct 2182; 33 L Ed 2d 101 (1972). Smith twice moved for a speedy trial— once in May 2020 and again in May 2021—so this factor weighs in his favor.

Finally, we consider whether Smith suffered any prejudice. "There are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to his defense." *People v Collins*, 388 Mich 680, 694; 202 NW2d 769 (1972). Pretrial incarceration necessarily "results in a degree of prejudice to the person." *Id*. And while anxiety caused by a lengthy delay can occur, anxiety alone cannot establish a speedy-trial violation. *Gilmore*, 222 Mich App at 462. Yet "[i]mpairment of defense is the most serious" form of prejudice in the context of a speedy-trial claim "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Collins*, 388 Mich at 694 (cleaned up). "If witnesses die or disappear during a delay, the prejudice is obvious." *Barker*, 407 US at 532. Loss of memory caused by the passage of time can also prejudice the defense. *Id*. But in considering prejudice, a reviewing court should look for examples about how the delay between arrest and trial harmed the defendant's ability to defend against the charges. See *Gilmore*, 222 Mich App at 462 (explaining that "general allegations of prejudice," such as that "delay causes witness' memories to fade," are insufficient to establish a speedy-trial violation).

As noted, prejudice is presumed in this case because of the lengthy delay between arrest and trial. And, undoubtedly, Smith suffered some amount of personal prejudice by the length of his incarceration awaiting trial, particularly considering the risk of exposure to COVID-19 in jails and prisons.[6] Most important to our review, however, is that the delay did not create any identifiable prejudice to the defense. Smith argues that one of Colen's uncles, Naem Johnson, died before trial, prejudicing Smith's ability to defend himself. Johnson had testified at the preliminary

---

[6] See, e.g., Angie Jackson, Detroit Free Press, *Michigan prisoner deaths from COVID-19 surpass 100*, <https://www.freep.com/story/news/local/michigan/2020/12/17/prisoner-covid-coronavirus-deaths-michigan/3925458001/> (posted December 17, 2020) (accessed March 13, 2024).

examination, and his testimony was read into the record at trial. Smith alleges that he lacked the opportunity and similar motive to develop Johnson's testimony. But Smith fails to explain why his attorney's cross-examination of Johnson at the preliminary examination was insufficient or how further development of Johnson's testimony would have benefited Smith's defense. Smith's trial counsel also stipulated to the reading of Johnson's preliminary examination testimony. By agreeing to its admission, Smith necessarily waived any argument that he lacked the opportunity and similar motive to develop Johnson's testimony on cross-examination. See MRE 804(b)(1) (providing that former testimony is not excluded by the rule against hearsay where the declarant is unavailable, testified as a witness at a prior hearing, and the testimony is now offered against a party who had "an opportunity and similar motive to develop it by direct, cross, or redirect examination); *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011) ("When defense counsel clearly expresses satisfaction with a trial court's decision, counsel's action will be deemed to constitute a waiver.").[7] And Smith does not allege that trial counsel was ineffective for stipulating to the admission of Johnson's testimony.

Even if not waived, Johnson's death did not prejudice Smith's ability to defend against the charges. Johnson was a witness for the prosecution. He identified Smith at the preliminary examination as the individual exiting the car before the shooting and testified that he heard the gunshots from his nearby porch. Johnson knew that Colen owned a handgun and that Colen's friends were known to periodically carry guns, but Johnson did not know if they were armed on the night of the shooting. The inability to question Johnson at trial about his courtroom identification did not prejudice Smith, as the defense did not dispute that Smith shot the victims. And, to Smith's benefit, the jury heard Johnson's testimony that Colen and his friends were known to carry firearms.[8]

Smith has also identified no defense witnesses who could not testify because of the delays before trial, nor has he suggested that his lengthy pretrial incarceration prevented him from preparing an adequate defense. In fact, Smith concedes in his brief that he "cannot show with specificity that witnesses were not available to him due to the delay, or that any necessary documentation was lost in the intervening time period." The record thus establishes that Smith did not suffer prejudice to his defense as a result of the delay between arrest and trial. See *People v Chism*, 390 Mich 104, 115; 211 NW2d 193 (1973) ("[O]n the matter of prejudice to defendant because of the length of time before his trial, the most important thing is that there is no evidence

---

[7] MRE 804 was amended effective January 1, 2024. We cite the version of the rule in effect at the time of Smith's trial.

[8] The prosecution claims that Johnson died only five months after the preliminary examination, so even if Smith's trial were held much sooner, Johnson still would not have been available to testify at trial. That is, the prosecution believes that the delay in bringing this case to trial was not the reason Johnson was unavailable for trial. We have been unable to confirm the date of Johnson's death in the record, so we decline to give weight to this assertion.

that a fair trial was jeopardized by delay, although obviously 27 months of incarceration is not an insignificant personal hardship.").

In sum, although the delay in bringing Smith to trial was substantial, the main reason for the delay was the unanticipated impact of the COVID-19 pandemic, which is not held against the prosecution. The prosecution also overcame the presumption of prejudice by showing that Smith's defense was not hindered by the delay in commencing trial. Balancing all the relevant factors, Smith has not established a violation of his right to a speedy trial.

## III. JURY INSTRUCTIONS

Smith next argues that the trial court erred by denying his requests to instruct the jury on both self-defense and voluntary manslaughter, and that failure to give these instructions infringed on his constitutional right to present a defense.

"Claims of instructional error are generally reviewed de novo by this Court, but the trial court's determination that a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). We also review de novo the constitutional issue whether a defendant was denied his right to present a defense. *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002).

"A criminal defendant has a state and federal constitutional right to present a defense." *Id*. at 326. "Instructional errors that directly affect a defendant's theory of defense can infringe" on this right. *Id*. at 326-327. Similarly, a criminal defendant is "entitled to have a properly instructed jury consider the evidence against him or her." *Dobek*, 274 Mich App at 82. Jury instructions must therefore "include all the elements of the charged offense, and must not exclude material issues, defenses, or theories if the evidence supports them." *People v Kosik*, 303 Mich App 146, 155; 841 NW2d 906 (2013). Additionally, "[a] defendant asserting an affirmative defense must produce *some evidence* on all elements of the defense before the trial court is required to instruct the jury regarding the affirmative defense." *People v Guajardo*, 300 Mich App 26, 34-35; 832 NW2d 409 (2013) (cleaned up; emphasis added). An affirmative defense does not negate the elements of a crime but rather "seeks to justify, excuse, or mitigate it." *People v Aspy*, 292 Mich App 36, 49; 808 NW2d 569 (2011) (cleaned up).

## A. SELF-DEFENSE

Smith argues that the trial court erred by failing to instruct the jury on self-defense. The Self-Defense Act, MCL 780.971 *et seq*., prescribes when the use of deadly force in self-defense is appropriate:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if . . .

(a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual. [MCL 780.972.]

Once a defendant injects the issue of self-defense into the trial and satisfies the initial burden of producing some supporting evidence, the prosecution bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *People v Reese*, 491 Mich 127, 155; 815 NW2d 85 (2012).

Smith argues that an instruction on self-defense was warranted because the evidence showed that he met with three people and at least one of them had a firearm. He also emphasizes the evidence that the victims appeared intimidating and directed him to the back of the house, and that King described him as looking scared as he was running toward the car after the shooting. Despite Smith's speculation, none of this evidence sheds any light on what happened that led to the shooting. As the trial court noted, there was evidence that Smith arranged to meet with the victims to exchange firearms, but there was no evidence that any of the victims was an aggressor or acted in a manner to cause Smith to honestly and reasonably believe that he needed to use deadly force to prevent his own death or great bodily harm. See MCL 780.972(1)(a).

Further, the locations of the victims' bodies and the nature of their wounds did not circumstantially suggest that Smith acted in self-defense. On the contrary, it suggested otherwise. The victims were discovered in different locations—one at a bedroom entrance, one outside by a back door, and the other in the backyard, alongside a trail of blood that led to a fence. Two of the victims had gunshot wounds to the back. This evidence suggested that the victims were attempting to flee when they were shot. In sum, Smith did not present "some evidence" from which a jury could find that Smith shot the victims because he honestly and reasonably believed that the use of deadly force was necessary to prevent imminent death or imminent great bodily harm. *Guajardo*, 300 Mich App at 34-35. Accordingly, the trial court did not abuse its discretion by declining to instruct the jury on self-defense.

## B.  VOLUNTARY MANSLAUGHTER

Smith also argues that the trial court should have instructed the jury on voluntary manslaughter.

Voluntary manslaughter is a necessarily included lesser offense of murder. *People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003). Simply put, "[m]anslaughter is murder without malice." *Id*. at 534. "Voluntary manslaughter requires a showing that (1) defendant killed in the heat of passion, (2) this passion was caused by an adequate provocation, and (3) there was no lapse of time during which a reasonable person could have controlled his passions." *People v Roper*, 286 Mich App 77, 87; 777 NW2d 483 (2009). "[W]hen a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence." *Mendoza*, 468 Mich at 541.

Once again, the absence of evidence explaining what happened right before the shooting precluded an instruction on voluntary manslaughter. The evidence showed that Smith met with three men to exchange firearms, but there was no evidence that some altercation occurred to

provoke Smith or that he otherwise killed the victims in the heat of passion. A jury would be left to speculate about the existence of any provocation, and whether this alleged provocation would cause a reasonable person to act out of passion. See *People v Pouncey*, 437 Mich 382, 390; 471 NW2d 346 (1991). In other words, the requested instruction was not supported by a rational view of the evidence. See *Mendoza*, 468 Mich at 541. Therefore, the trial court did not abuse its discretion by refusing to instruct the jury on voluntary manslaughter.

Finally, because the evidence did not support jury instructions on self-defense or voluntary manslaughter, failure to give those instructions did not infringe on Smith's constitutional right to present a defense. See *Kurr*, 253 Mich App at 326-327.

## IV. SUFFICIENCY OF THE EVIDENCE

Next, Smith argues that there was insufficient evidence of premeditation and deliberation to support his convictions of first-degree murder.

We review a sufficiency-of-the-evidence challenge de novo. *People v Harverson*, 291 Mich App 171, 176; 804 NW2d 757 (2010). In determining whether sufficient evidence was presented to support a conviction, we view the evidence in a light most favorable to the prosecution, with any conflicts in the evidence resolved in the prosecution's favor, and to determine whether a rational trier of fact could find that the evidence proved the essential elements of the crime beyond a reasonable doubt. *People v Solloway*, 316 Mich App 174, 180-181; 891 NW2d 255 (2016). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

Smith was charged with three counts of first-degree premeditated murder, MCL 750.316(1)(a), for causing the deaths of Colen, Parker, and Vary. "The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). "Premeditation is not statutorily defined and cannot be evaluated in a rigid and mechanical manner." *People v Walker*, 330 Mich App 378, 383; 948 NW2d 122 (2019). A murder is committed deliberately if it is done without adequate provocation or while undisturbed by "hot blood." *People v Clark*, 330 Mich App 392, 436; 948 NW2d 604 (2019). A murder is premeditated when the defendant had the opportunity to consider his actions for some length of time before completing the murder. *Id*. at 436-437. "Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a second look." *People v Oros*, 502 Mich 229, 242; 917 NW2d 559 (2018) (cleaned up). "While the minimum time necessary to exercise this process is incapable of exact determination, it is often said that premeditation and deliberation require only a brief moment of thought or a matter of seconds." *Id*. at 242-243 (cleaned up).

"Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation." *People v Bass*, 317 Mich App 241, 266; 893 NW2d 140 (2016) (cleaned up). "Because of the inherent difficulty of proving a defendant's state of mind, only minimal circumstantial evidence from which intent may be inferred need be presented." *People v Cameron*, 291 Mich App 599,

615; 806 NW2d 371 (2011). Premeditation may also be shown through "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *Walker*, 330 Mich App at 384 (cleaned up). But the brutality of a killing alone does not support the elements of premeditation and deliberation. *People v Hoffmeister*, 394 Mich 155, 159-160; 229 NW2d 305 (1975).

The circumstances of the shooting and Smith's post-offense conduct provided sufficient circumstantial evidence for a rational jury to find the necessary elements of premeditation and deliberation. Smith did not dispute that he met with the victims and shot all three of them. The evidence showed that Smith arranged to meet with the men to exchange guns, but there was also evidence supporting an inference that he robbed them. The pockets of one of victims had been turned out, no money or weapons were recovered from any of the victims, and there was evidence that Smith had a large amount of cash and another gun just after the shooting. In addition, each victim was shot multiple times and in a manner that quickly caused their deaths, and their bodies were discovered at locations that supported an inference that they were trying to flee when they were shot. Viewed in a light most favorable to the prosecution, the evidence supported an inference that Smith arranged to meet with the men to trade guns, but decided to rob and kill all three victims, shooting the first in the bedroom and shooting the other two as they tried to flee through the back door. The location and number of gunshot wounds sustained by each victim supports an inference that Smith's intent was to kill. After the shooting, even though King was present and Smith's brother asked about the money and a gun, Smith made no statements to suggest that the killings were justified. Instead, he hid the gun he used underneath a doghouse on his property, evidence a jury could find shows consciousness of guilt. We therefore conclude that the prosecution presented sufficient evidence of premeditation and deliberation to support Smith's first-degree murder convictions.

## V. COURT COSTS

Smith next challenges the trial court's assessment of $612 in court costs under MCL 769.1k(1)(b)(*iii*), arguing that the statute is unconstitutional. Because he did not object to the assessment of costs below or otherwise raise this issue before the trial court, the issue is unpreserved and our review is limited to plain error affecting Smith's substantial rights. *People v Konopka (On Remand)*, 309 Mich App 345, 356; 869 NW2d 651 (2015).

Smith argues that MCL 769.1k(1)(b)(*iii*) infringes on his due-process right to appear before an impartial judge because trial court judges are incentivized to convict defendants in order to impose costs to raise money to fund the courts. He also claims that the statute violates the separation of powers because the funding arrangement prevents the judicial branch from accomplishing its constitutionally assigned functions of maintaining impartiality in criminal proceedings. These arguments have already been considered and rejected by this Court. *People v Johnson*, 336 Mich App 688, 693-705; 971 NW2d 692 (2021); *People v Cameron*, 319 Mich App 215, 228-229, 231, 235; 900 NW2d 658 (2017). Because we are bound to follow those decisions under MCR 7.215(J)(1), the trial court's assessment of $612 in court costs was not erroneous.

## VI. STANDARD 4 BRIEFS

Smith raises additional issues in two pro se briefs, filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4.

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

First, Smith argues that trial counsel was ineffective for not moving to suppress evidence related to his DNA sample. He asserts that suppression was appropriate because the warrant and supporting affidavit used to obtain the sample were not signed by the magistrate and the search warrant incorrectly stated that the DNA sought was for an armed robbery case, not a homicide. Because Smith did not preserve this claim by moving for a new trial or an evidentiary hearing, our review is limited to errors apparent from the record. *People v Lopez*, 305 Mich App 686, 693; 854 NW2d 205 (2014).

The Michigan and United States Constitutions require that criminal defendants receive the assistance of counsel in their defense. Const 1963, art 1, § 20; US Const Am VI. "The right to counsel . . . is the right to the effective assistance of counsel." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016). "To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Id*. "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise." *People v Traver*, 328 Mich App 418, 422; 937 NW2d 398 (2019) (cleaned up).

Smith contends that the DNA evidence should have been suppressed because his DNA was obtained pursuant to an unsigned affidavit and warrant. Smith is correct that an unsigned warrant is presumed to be invalid. *People v Barkley*, 225 Mich App 539, 544-545; 571 NW2d 561 (1997). Although Smith has submitted unsigned copies of the affidavit and warrant, signed copies of these documents have been submitted by the prosecution. MCL 780.655(1) requires that the police leave or provide a copy of the search warrant at the time of a search. But failure to follow the ministerial requirements of MCL 780.655(1) does not require exclusion of evidence seized pursuant to an otherwise valid search warrant. *People v Sobczak-Obetts*, 463 Mich 687, 708-712; 625 NW2d 764 (2001). At most, the record suggests that Smith may have been provided with unsigned copies of the documents when his DNA was collected. But because the record establishes that the warrant and affidavit were signed, Smith has not shown that counsel was ineffective for failing to move to suppress on that basis. Any motion would have been futile, and counsel cannot be ineffective for failing to bring a futile motion. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Smith also argues that his DNA sample was not legally obtained because the search warrant inaccurately stated that his DNA was being sought in connection with an armed robbery case. Courts have upheld warrants that contained typographical or clerical errors, such as in the description of the place to be searched, if the affidavit or information available to the police otherwise provided the correct information. See *People v Westra*, 445 Mich 284, 286; 517 NW2d 734 (1994); *People v Hampton*, 237 Mich App 143, 151-152; 603 NW2d 270 (1999). The affidavit and application for the search warrant correctly set forth facts related to this case and accurately stated that the request for Smith's DNA sample involved a homicide case. Although the search

warrant erroneously referred to an armed robbery case, that error had no impact on the determination of probable cause for issuance of the warrant or the scope of the search that was conducted pursuant to the warrant. Put another way, there is no basis to conclude that the magistrate issued the warrant on the basis of false information such that suppression of any evidence obtained by the warrant is required. See *People v Hellstrom*, 264 Mich App 187, 197; 690 NW2d 293 (2004). Thus, the error did not affect the validity of the search. Any motion to suppress on this basis would have also been futile.

Furthermore, even if defense counsel had successfully moved to suppress the results of the DNA testing, there is no reasonable probability that the outcome would have been any different. The significance of the DNA evidence was that it linked Smith to the firearm recovered by the police. But the fact that the firearm was found underneath a dog house at Smith's home also independently linked the firearm to him. More significantly, because the defense did not dispute that Smith shot the victims, his DNA on that firearm mattered little to this case. The main issue at trial was Smith's state of mind when he shot the victims, and the DNA had no relevance to that issue. Thus, Smith has failed to show that he was prejudiced by counsel's failure to move to suppress the DNA evidence.

## B. PROSECUTORIAL MISCONDUCT

Smith next contends that the prosecutor made several improper remarks during closing and rebuttal arguments that require reversal. Because Smith did not object to any of the challenged statements at trial, these claims are unpreserved and reviewed for outcome-determinative, plain error. *Unger*, 278 Mich App at 235.

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *Dobek*, 274 Mich App at 63. "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id.* at 64. Consistent with that rule, "[p]rosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *People v Brown*, 279 Mich App 116, 135; 755 NW2d 664 (2008). Prosecutors are generally "accorded great latitude regarding their arguments and conduct." *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (cleaned up). They may argue the evidence and reasonable inferences arising from the evidence in support of their theory of the case. *Id.*

First, Smith asserts that it was improper for the prosecutor to argue that he fled from the police at the time of his arrest and that this conduct demonstrated consciousness of guilt. The challenged remarks were supported by the evidence that Smith initially ignored police commands to stop when he exited the car and walked toward the gas station before he was arrested. See *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995) (explaining that flight encompasses actions such as "fleeing the scene of the crime, leaving the jurisdiction, running from police, resisting arrest, and attempting to escape custody"). And, contrary to Smith's assertion, the trial court instructed the jury on flight, explaining that evidence of flight does not itself prove guilt but can show a defendant's consciousness of guilt. See M Crim JI 4.4. Smith does not argue that a flight instruction was improper, and neither were the prosecutor's remarks about flight.

-13-

Smith challenges several additional portions of the prosecutor's closing argument, asserting that the prosecutor improperly expressed her personal opinion about the case and made arguments that were not supported by the evidence. It is improper for a prosecutor to express a personal opinion about a case by suggesting that she has some special knowledge, unknown to the jury, that the defendant is guilty. See *People v Meissner*, 294 Mich App 438, 456; 812 NW2d 37 (2011); *People v Thomas*, 260 Mich App 450, 453-454; 678 NW2d 631 (2004). Viewing the challenged remarks in context, the prosecutor was advancing her theory of the case on the basis of the evidence presented at trial. See *Bahoda*, 448 Mich at 282. The prosecutor did not suggest that she had any special knowledge, unknown to the jury, that Smith was guilty. Accordingly, the prosecutor's remarks were not improper.

Smith also challenges some of the prosecutor's rebuttal arguments, but viewed in context, the prosecutor was simply responding to defense counsel's arguments by offering alternative views of the evidence, which, again, were supported by the evidence and reasonable inferences arising from the evidence. These remarks were not improper. See *id*. Finally, to the extent that the prosecutor's remark that Smith was the only person alive who knew what happened could be interpreted as an improper comment on Smith's failure to testify, see *People v Fyda*, 288 Mich App 446, 463-464; 793 NW2d 712 (2010), any error does not entitle Smith to relief. The comment was brief and isolated, and an appropriate instruction upon timely objection could have cured any perceived prejudice. See *People v Jackson (On Reconsideration)*, 313 Mich App 409, 425; 884 NW2d 297 (2015) (cleaned up) (explaining that an error does not require reversal "where a curative instruction could have alleviated any prejudicial effect").

## C. FAILURE TO DISCLOSE CODEFENDANT'S PLEA DEAL

Finally, Smith argues that he is entitled to a new trial because the prosecution suppressed evidence that the police promised to help King with her case if she cooperated and testified at Smith's trial. Because Smith did not move for a new trial in the trial court, this issue is unpreserved, and our review is limited to plain error affecting Smith's substantial rights. See *Unger*, 278 Mich App at 235.

In *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Summed up, to prove a *Brady* violation, the defendant must establish that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014).

Attached to Smith's supplemental Standard 4 brief is a written statement from King, in which she alleges that the police told her that "if I testify that they would help me get out which did get me bond and they would talk to the prosecutor about my case." This statement is not part of the lower court record. As a general rule, appeals to this Court are heard on the original record, MCR 7.210(A), and a party "may not now expand the record on appeal," *People v Nix*, 301 Mich App 195, 203; 836 NW2d 224 (2013). We therefore decline to consider King's statement.

-14-

On the record before us, Smith cannot establish that the prosecution suppressed evidence of any agreement to benefit King if she testified against Smith. King was still a codefendant at the time of Smith's trial. She had been charged with drug offenses and CCW arising out of the traffic stop where Smith was arrested. Her case had not yet been resolved, and she testified at trial that she was not aware that her testimony could lead to a favorable disposition of her case. She claimed that she was testifying to tell the truth and did not expect to receive anything in exchange for her testimony. At the preliminary examination, however, King admitted that she was testifying in hopes of receiving a favorable disposition in her case or of receiving a plea deal in exchange for her testimony.

The prosecution concedes that King's charges were ultimately dismissed but denies that a deal with the prosecution was the reason. King was hardly a cooperative witness for the prosecution at trial; she claimed that statements attributed to her in police interviews and the preliminary examination were not accurate, and she even refused to have her recollection refreshed. Despite King's change of tune between the preliminary examination and trial, there is no evidence in the record of any agreement with King in exchange for her trial testimony. To the extent that King believed she might benefit by testifying against Smith, this information was not suppressed as it was part of King's preliminary examination testimony. Even so, King's subjective hopes of a deal do not establish that a deal in fact existed. In sum, Smith has not shown that there was any agreement between King and the prosecutor at the time of trial that required disclosure.

Smith also cannot show that the prosecutor knowingly used false testimony from King about the lack of an agreement to obtain his convictions. "It is well established that 'a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction . . . .' " *People v Smith*, 498 Mich 466, 475-476; 870 NW2d 299 (2015), quoting *Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959). As discussed, the record does not reveal any agreement by the prosecutor with King in exchange for her testimony. Smith has therefore not shown that King's testimony at trial—that she had no such agreement—was false, even if she had hoped to obtain such an agreement when she testified at the preliminary examination.

We affirm.


/s/ Kristina Robinson Garrett
/s/ Michael J. Riordan
/s/ Mark J. Cavanagh